[833 NE2d 239, 800 NYS2d 96]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v KENNETH J. PAULMAN, Appellant.

Argued June 2, 2005; decided June 29, 2005

**POINTS OF COUNSEL**

*John E. Tyo,* Shortsville, for appellant. I. The actions of Trooper Oliver in directing defendant to write a statement were intended or likely to elicit an incriminating response; it was "interrogation" requiring the *Miranda* warnings. The statement should be suppressed and Mr. Paulman's conviction reversed. (*People v Yukl,* 25 NY2d 585; *Rhode Island v Innis,* 446

US 291; *People v Lanahan,* 55 NY2d 711; *People v Ferro,* 63 NY2d 316; *People v Velasquez,* 68 NY2d 533; *People v Kollar,* 305 AD2d 295; *People v Stoesser,* 53 NY2d 648; *Miranda v Arizona,* 384 US 436; *People v Maerling,* 46 NY2d 289; *People v Tanner,* 30 NY2d 102.) II. The error in allowing the handwritten statement into evidence was not harmless. (*Chapman v California,* 386 US 18; *Fahy v Connecticut,* 375 US 85; *People v Crimmins,* 36 NY2d 230.) III. The statements given to Investigator Baldwin should have been suppressed, because although they were made after the *Miranda* warnings, the questioning was too close in sequence to the prior un-Mirandized statement given to Trooper Oliver and there was no attenuation between the two. (*People v Gomez,* 192 AD2d 549; *Miranda v Arizona,* 384 US 436; *People v Bethea,* 67 NY2d 364; *People v Chapple,* 38 NY2d 112; *People v Tanner,* 30 NY2d 102; *People v Bolus,* 185 AD2d 1007; *People v Jones,* 87 AD2d 761.) IV. The error allowing into evidence the statements made to Investigator Baldwin was not harmless. (*People v Hamlin,* 71 NY2d 750; *People v Almestica,* 42 NY2d 222; *Fahy v Connecticut,* 375 US 85; *Chapman v California,* 386 US 18; *People v Crimmins,* 36 NY2d 230; *People v Mees,* 47 NY2d 997.)

*R. Michael Tantillo, District Attorney,* Canandaigua (*James B. Ritts* of counsel), for respondent. I. The trial court properly determined that the statement given by defendant was not the product of interrogation or its functional equivalent. (*People v Yukl,* 25 NY2d 585; *People v Bryant,* 59 NY2d 786; *People v Lynes,* 49 NY2d 286; *Rhode Island v Innis,* 446 US 291; *People v Ferro,* 63 NY2d 316; *People v Lanahan,* 55 NY2d 711; *People v Prochilo,* 41 NY2d 759; *People v Rivers,* 56 NY2d 476.) II. Assuming arguendo, the trial court erred in denying the suppression of defendant's unwarned handwritten statement, the subsequent statements to Investigator Baldwin after *Miranda* warnings were properly admitted. (*People v Gomez,* 192 AD2d 549, 82 NY2d 806; *People v Kaufman,* 288 AD2d 895, 97 NY2d 684; *Oregon v Elstad,* 470 US 298; *People v Chapple,* 38 NY2d 112; *People v Gary,* 31 NY2d 68; *People v Nisbett,* 225 AD2d 801, 88 NY2d 939; *People v Samuels,* 11 AD3d 372; *People v Smith,* 275 AD2d 951, 96 NY2d 739.) III. Assuming, arguendo, the trial court erred in admitting any or all of defendant's final three statements, any such error was harmless. (*People v Crimmins,* 36 NY2d 230; *People v Schaeffer,* 56 NY2d 448; *People v Harris,* 57 NY2d 335; *People v Eastman,* 85 NY2d 265; *People v Hamlin,* 71 NY2d 750.)

GRAFFEO, J.

During a child sexual abuse investigation, defendant made four incriminating statements to the police in successive interrogations spanning a period of several hours. The Appellate Division ruled that one of the statements was inadmissible because it had not been preceded by *Miranda* warnings. The primary issue presented in this case is whether two statements defendant made after he was given *Miranda* warnings and waived his right to remain silent should have been suppressed due to the prior, unwarned statement. Under the circumstances of this case, we conclude the subsequent statements were properly received in evidence.

In the spring of 2002, defendant Kenneth Paulman resided with his girlfriend in an apartment complex in Canandaigua, New York. The People offered evidence at the suppression hearing that, just after midnight on May 4, 2002, the police were contacted by the mother of Ashlyn, a four-year-old girl, who stated that she had information relating to a child sexual abuse investigation. That same night, defendant had called the police and reported that he had been threatened by members of Ashlyn's family. After speaking to Ashlyn's mother, New York State Trooper Jean Oliver and her partner went to defendant's apartment. Defendant answered the door and invited Trooper Oliver inside. Trooper Oliver told defendant that she was there to investigate some allegations of sexual abuse. Defendant spoke freely about the allegations, telling her that his girlfriend frequently babysat Ashlyn and Tiffany, an eight-year-old girl who also lived in the complex. He described an incident when he tickled the naked girls, who had just stepped out of their bath. During this incident, he claimed that he had accidentally slipped a finger into Ashlyn's vagina. Defendant also detailed other occasions when he and Ashlyn had been in bed and he had rubbed Ashlyn against his penis. When he was advised that Ashlyn had some redness near her vagina, defendant explained that this could have been from his finger or belt buckle. During this conversation, defendant took Trooper Oliver around the apartment and showed her the locations where the various incidents had occurred. Toward the end of their discussion, defendant mentioned the name of another girl from the complex, remarking that "[t]he only mistake I made was with Autumn." When asked what he meant, defendant admitted that he had engaged in sexual intercourse with Autumn, who defendant

believed to be 12 years old (the police later established that Autumn was 13 years old).

Trooper Oliver next asked defendant to accompany her to the barracks to speak to an investigator. Defendant agreed and rode with the troopers in their patrol car. Upon arrival at the barracks, defendant was seated in the patrol room, an area with two open doors. Defendant was told that another State Police officer—Investigator Christopher Baldwin—would arrive shortly. In the meantime, Trooper Oliver gave defendant a notepad and said: "Why don't you just start taking some notes then as to, you know, your best recollection as to what has happened." Defendant composed a statement in which he repeated the admissions previously made concerning his physical contact with Ashlyn and Tiffany. As he was working on the statement, defendant told Trooper Oliver that he was hungry, and she brought him pizza and soda.

When Investigator Baldwin arrived at the barracks at about 3:00 A.M., he saw that defendant was in the patrol room writing on a notepad. Defendant finished the handwritten statement at about 3:30 A.M. He remained in the patrol room consuming his meal until approximately 4:00 A.M., at which time the investigator took defendant to his office at the back of the barracks. Investigator Baldwin read defendant his *Miranda* rights and defendant acknowledged that he understood them but wished to give a statement. The investigator then began questioning defendant concerning his contact with Ashlyn, Tiffany and Autumn. Defendant made a series of oral admissions, repeating what he had told Trooper Oliver and adding further details pertaining to the incidents. After defendant was again given *Miranda* warnings at 5:40 A.M., he signed a *Miranda* waiver and Investigator Baldwin began typing a written statement, recording defendant's answers to specific questions. Defendant initialed each page and signed the typewritten, question-and-answer statement, which was completed at 7:40 A.M. In this statement, in addition to the sexual contact he had earlier described, defendant admitted having engaged in oral sex with Ashlyn and Autumn and acknowledged incidents involving his girlfriend's two-year-old son and another 12-year-old girl in the complex. At the conclusion of the interrogation, defendant was formally placed under arrest.

Defendant was charged in a 22-count indictment with sexual misconduct involving five children who resided in the complex.[1] Prior to trial, he moved to suppress all four of the statements made to the police: the oral statements to Trooper Oliver made in his apartment; the handwritten statement he wrote in the patrol room; the oral statements to Investigator Baldwin elicited in Baldwin's office; and the typewritten statement that followed. Defense counsel argued that the first two statements should be suppressed because they were not preceded by *Miranda* warnings. Although the last two statements were obtained after *Miranda* warnings, defendant claimed they were also inadmissible because they were tainted by the prior, unwarned custodial interrogation.

The suppression court concluded that all of the statements were admissible at trial. With respect to the initial admissions made at defendant's apartment, the court held that *Miranda* warnings were not necessary because defendant was not in police custody. The court found that defendant was in custody when he made the handwritten statement in the patrol room but that the statement was admissible because defendant was not subjected to interrogation. Having rejected defendant's argument that the first two statements were improperly elicited in violation of the *Miranda* rule, the court also rejected defendant's claim that the third and fourth statements—concededly made after defendant was advised of his *Miranda* rights—should be suppressed.

At trial, all four of defendant's statements were received in evidence. In addition, three of the child victims testified against defendant. The four-year-old victim did not testify, but defendant's abuse of that child was described by another victim. At the close of proof, defendant was convicted of 13 counts of the 22-count indictment.[2] A determinate sentence of 17 years was imposed for the most serious charge of sodomy in the first

---

**1.** Defendant was charged with four counts of sexual abuse in the first degree; three counts of sexual abuse in the second degree; five counts of endangering the welfare of a child; one count of sodomy in the first degree; one count of sodomy in the second degree; two counts of rape in the first degree; two counts of rape in the second degree; three counts of forcible touching; and one count of course of sexual conduct against a child in the first degree.

**2.** Defendant was convicted of one count of sodomy in the first degree, two counts of sexual abuse in the first degree, and one count of endangering the welfare of a child relating to incidents involving Ashlyn; two counts of rape in the second degree, two counts of sexual abuse in the second degree, one count

degree, a consecutive sentence of 2 to 6 years was imposed for one count of rape in the second degree and lesser concurrent sentences were ordered for the other offenses.

On appeal, the Appellate Division affirmed the conviction. The Court disagreed with the suppression court's analysis with respect to the handwritten statement, finding that it should have been suppressed because Trooper Oliver's suggestion that defendant write down his thoughts was the functional equivalent of interrogation, thereby requiring *Miranda* warnings. Despite this error, the Court concluded that reversal was not warranted because the first, third and fourth statements were properly received in evidence and the improper admission of the second statement amounted to harmless error. Although our analysis differs in some respects from that of the Appellate Division, we also affirm.

In this Court, defendant has abandoned his argument that the first statement—the oral admissions he made to Trooper Oliver in his apartment—should have been suppressed. Conceding that these initial comments were admissible at trial, defendant now contends that the remaining three statements should have been suppressed because the police error in failing to give *Miranda* warnings prior to eliciting the second, handwritten statement tainted each of the subsequent statements, even though they were preceded by *Miranda* warnings.

The People continue to argue that defendant was not subjected to custodial interrogation when he made the handwritten statement and, as such, there was no *Miranda* violation. In the alternative, the People submit that even if the handwritten statement was inadmissible as the Appellate Division determined, the subsequent Mirandized statements were nonetheless admissible because they were not part of an unbroken, continuous chain of events flowing from the prior, unwarned statement. Since the admissions in the handwritten statement were the same as those in the other statements, the People maintain that its receipt into evidence at trial was harmless error.

I.

■ Because the People assert that the Appellate Division erred in concluding that the handwritten statement should have

of sodomy in the second degree, one count of forcible touching and one count of endangering the welfare of a child for incidents involving Autumn; one count of endangering the welfare of a child for an incident involving a 12 year old; and one count of endangering the welfare of a child for an incident involving Tiffany.

been suppressed, our first task is to address the custodial interrogation issue. Whether a suspect has been subjected to custodial interrogation presents a mixed question of law and fact over which this Court has limited powers of review (*People v Cruz*, 90 NY2d 961 [1997]; *People v Harrison*, 82 NY2d 693 [1993]; *People v Harrison*, 57 NY2d 470, 477 [1982]). The determination of the Appellate Division must be affirmed unless there is no record basis for the conclusion it reached.

The *Miranda* rule protects the privilege against self-incrimination and, "because the privilege applies only when an accused is 'compelled' to testify, the safeguards required by *Miranda* are not triggered unless a suspect is subject to 'custodial interrogation'" (*People v Berg*, 92 NY2d 701, 704 [1999]). The standard for assessing a suspect's custodial status is whether a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave (*see People v Harris*, 48 NY2d 208, 215 [1979]; *People v Yukl*, 25 NY2d 585, 589 [1969], *cert denied* 400 US 851 [1970]). "The term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response" (*People v Ferro*, 63 NY2d 316, 322 [1984], *cert denied* 472 US 1007 [1985], quoting *Rhode Island v Innis*, 446 US 291, 301 [1980]).

Based on this record, we cannot say that the Appellate Division erred in ruling that defendant was subjected to custodial interrogation when, after bringing defendant to the barracks, Trooper Oliver produced a notepad (which defendant had not requested) and told defendant to write down his "best recollection" of what had occurred. These circumstances support the inference that the handwritten statement was not spontaneous but was induced by Trooper Oliver, who should have known that her actions were likely to elicit an incriminating response. That being so, there is no basis to disturb the Appellate Division's conclusion that the handwritten statement should have been suppressed because it was elicited without *Miranda* warnings.

## II.

Having upheld the determination that an improper, unwarned statement was obtained prior to Investigator Baldwin's interrogation, we turn to whether this error rendered the subsequent

statements inadmissible. Although the *Miranda* rule was developed by the United States Supreme Court under the Fifth Amendment, New York courts have embraced the rule as consistent with article I, § 6 of the New York Constitution, which ensures that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself or herself." In cases involving successive interrogations where a Mirandized statement was preceded by an improper, unwarned admission, our Court has recognized that the State Constitution may provide rights broader than those guaranteed under the Fifth Amendment (*People v Bethea*, 67 NY2d 364, 368 [1986]).

In *Oregon v Elstad* (470 US 298 [1985]), the Supreme Court suggested that, once *Miranda* warnings were given, the "taint" of a prior, unwarned statement was dissipated, rendering the subsequent statement admissible at trial. The Court reasoned:

> "[A] careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will' " (*id.* at 310-311).

Concerned that *Elstad* could be interpreted as holding that the mere fact that warnings were uttered would be sufficient to justify the admission of subsequent statements, this Court held in *People v Bethea* (67 NY2d 364 [1986]) that more was required under article I, § 6 of the New York Constitution. Adhering to the rule articulated in *People v Chapple* (38 NY2d 112, 114 [1975]), we clarified that where an improper, unwarned statement gives rise to a subsequent Mirandized statement as part of a "single continuous chain of events," there is inadequate assurance that the *Miranda* warnings were effective in protecting a defendant's rights, and the warned statement must also be suppressed.

To determine whether there is a "single continuous chain of events" under *Chapple*, New York courts have considered a number of factors, including the time differential between the *Miranda* violation and the subsequent admission; whether the same police personnel were present and involved in eliciting each statement; whether there was a change in the location or nature of the interrogation; the circumstances surrounding the *Miranda* violation, such as the extent of the improper question-

ing; and whether, prior to the *Miranda* violation, defendant had indicated a willingness to speak to police.[3] No one factor is determinative and each case must be viewed on its unique facts. The purpose of the inquiry is to assess where there was a sufficiently "definite, pronounced break in the interrogation" to dissipate the taint from the *Miranda* violation (*Chapple*, 38 NY2d at 115). If so, the Mirandized statement is admissible at trial despite the prior, unwarned statement.[4]

■ Applying the *Chapple* analysis, in this case there was a change in police personnel involved in the successive interrogations, which took place in different locations, and there were significant differences in the methods of eliciting information. Although prompted by Trooper Oliver, the handwritten statement was crafted by defendant without further involvement by the authorities. After defendant consumed a meal for about a half hour, Investigator Baldwin took him to his office, gave him *Miranda* warnings, and engaged in traditional, intensive interrogation, recording defendant's admissions in a structured question-and-answer format. Under these circumstances, once Investigator Baldwin commenced his interrogation, a reasonable suspect in defendant's position would have perceived a marked change in the tenor of his engagement with police.

It is also significant that, from the moment defendant encountered the police (who were, in part, responding to his telephone call for assistance), defendant exhibited a willingness to provide an explanation of his conduct and, once at the police barracks, he never expressed any reluctance to discuss the allegations. Moreover, the *Miranda* violation occurred *after* defendant had freely chosen to answer police questions in a noncustodial setting. Regardless of whatever motivated defendant to speak to police at his apartment and, later, to make the Miran-

---

3. *See e.g., People v Samuels* (11 AD3d 372 [1st Dept 2004], *lv denied* 4 NY3d 802 [2005]); *People v Cowell* (11 AD3d 292 [1st Dept 2004], *lv denied* 4 NY3d 743 [2004]); *People v Kollar* (305 AD2d 295 [1st Dept 2003], *appeal dismissed* 1 NY3d 591 [2004]); *People v Smith* (275 AD2d 951 [4th Dept 2000], *lv denied* 96 NY2d 739 [2001]); *People v Nisbett* (225 AD2d 801 [2d Dept 1996], *lv denied* 88 NY2d 939 [1996]); *People v Gomez* (192 AD2d 549 [2d Dept 1993], *lv denied* 82 NY2d 806 [1993]); *People v Bolus* (185 AD2d 1007 [3d Dept 1992], *lv denied* 81 NY2d 785 [1993]).

4. In support of their respective arguments, the parties have cited rules developed in search and seizure cases (e.g., the attenuation doctrine) as well as New York right-to-counsel cases. We caution that the *Chapple* rule is tailored to safeguard the right against self-incrimination—it is not to be confused with the approaches taken in other contexts where different constitutional principles are at stake.

dized statements, his decision to provide information did not flow as part of a "single continuous chain of events" from Trooper Oliver's failure to give *Miranda* warnings prior to eliciting the handwritten statement at the barracks.

Defendant contends that our decision in *Bethea* mandates suppression in this case. In *Bethea*, after learning about an attempted burglary by two men whose appearance matched that of defendant and his companion, the police stopped them on the street in the vicinity of the crime and questioned them about the contents of a bag they were carrying. Upon discovering that the bag contained a revolver, the police arrested defendant. While transporting him to the police station, one of the officers asked defendant where he had obtained the gun, eliciting an incriminating response. At the precinct, the same officer gave defendant *Miranda* warnings, and then resumed the interrogation, at which point defendant repeated what he had said in the vehicle. This Court concluded that the Mirandized statement should have been suppressed because it was elicited as part of a single continuous chain of events flowing from the improper, unwarned custodial interrogation in the police car.

In contrast to this case, in *Bethea* the defendant was arrested, placed in the police vehicle and interrogated while being transported to the police station—the initial incriminating statements were clearly obtained in violation of *Miranda* requirements. Here, defendant initiated the arrival of police at his home and made incriminating statements while showing Trooper Oliver around his apartment. His first admissions were therefore not the product of police misconduct. Furthermore, in *Bethea*, there was no significant break in time between the inquiry in the car and the interrogation at the police station, nor was there any change in the nature or tenor of the questioning, while here there was a cessation of interrogation while defendant ate and significant differences in the tenor and method of inquiry. In *Bethea*, the Mirandized statement was elicited by the same police officer who had accosted defendant on the street, arrested him, and obtained the unwarned statement. Therefore, a reasonable suspect in defendant's position would not have perceived a distinction between the interrogation in the car and the interrogation at the station. Moreover, the defendant had not previously expressed a desire to talk to the police. The same is not true here, where there was a change in police personnel and a defendant who, from the inception of his encounter with police, expressed a willingness to give a statement.

Defendant's reliance on the Supreme Court's recent decision in *Missouri v Seibert* (542 US 600 [2004]) is similarly misplaced. In *Seibert*, the Court assessed the constitutional propriety of a police protocol—the "question first" technique—whereby the authorities conducting custodial interrogation would intentionally withhold *Miranda* warnings until they extracted an incriminating statement from the suspect. There, defendant—later convicted of murder for the arson-related death of a teenage charge—was arrested and brought to the police station where she was questioned without *Miranda* warnings until she admitted that she knew the victim was to die in the fire. At the suppression hearing, the interrogating officer testified that, although defendant had been formally arrested, he intentionally withheld *Miranda* warnings, employing the "question first" protocol. After defendant made the incriminating statements, he administered *Miranda* warnings, obtained a waiver of rights, and resumed the interrogation, convincing defendant to repeat the prior statements.

A majority of the Court found that the "question first" practice was an impermissible end run around the *Miranda* rule, necessitating suppression of the Mirandized statement unless the People could show, notwithstanding the police misconduct, that the *Miranda* warnings were effective. Employing a multifactored test,[5] the *Seibert* plurality concluded that the Mirandized statement was inadmissible because "[t]he un-

---

5. The plurality's multifactored test considers "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first" (*Seibert*, 542 US at 615). In his concurring opinion, Justice Kennedy— who cast the fifth vote—did not endorse the multifactored test, holding that he would adhere to the *Elstad* analysis, except when the police deliberately employ the "question first" protocol. In that instance, under Justice Kennedy's rationale the admissibility of the subsequent statement turns on a "narrower test," which focuses on whether there was "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning" or "[c]urative measures . . . designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver" (542 US at 622 [Kennedy, J., concurring]). Because the statements in this case are admissible under the plurality's more stringent test, they are necessarily admissible under Justice Kennedy's analysis. Since Justice Kennedy's narrower test is triggered only when the police have intentionally employed a "question first" practice— which did not occur here—we need not address it further.

warned interrogation was conducted in the station house, . . . the questioning was systematic, exhaustive, and managed with psychological skill" and "[t]he warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment" (542 US at 616). The plurality reasoned that, under these circumstances, "[i]t would have been reasonable to regard the two sessions as parts of a continuum" (542 US at 616-617).[6] The police error in this case was not comparable to the "question first" protocol condemned in *Seibert*, nor was the unwarned statement elicited through a process of systematic, exhaustive or psychologically coercive questioning. And given the break in questioning, change in location and police personnel, and distinctions in the nature of the interrogation, the "continuum" present in *Seibert* was absent here.

For all of these reasons, we conclude as a matter of law that the Mirandized statements in this case were admissible under state and federal constitutional standards.

## III.

█ Although the two statements given after *Miranda* warnings were properly introduced at trial, the fact remains that the earlier, unwarned statement, also introduced by the People at trial, should have been suppressed. Defendant argues that reversal of his conviction is warranted because the admission of this statement was not harmless error. The Appellate Division rejected this argument, as do we.

The handwritten statement was cumulative of the oral admissions defendant made earlier at his apartment to Trooper Oliver. Moreover, based on the trial testimony of three of the victims, and defendant's detailed admissions in the first, third and fourth statements, the proof of guilt was overwhelming. There is no reasonable possibility that the admission of the unwarned statement affected the verdict.

Accordingly, the order of the Appellate Division should be affirmed.

---

**6.** There are similarities between the *Seibert* plurality's "continuum" analysis and the "single continuous chain of events" test long employed by this Court in successive interrogation cases. We emphasize, however, that our rule does not depend on the presence of intentional police misconduct, but is applied whenever a Mirandized statement follows an unwarned statement.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK, ROSEN-BLATT, READ and R.S. SMITH concur.

Order affirmed.