People v Nieves (2025 NY Slip Op 50409(U))

[*1]

People v Nieves

2025 NY Slip Op 50409(U)

Decided on March 24, 2025

Criminal Court Of The City Of New York, Bronx County

Lewis, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 24, 2025
Criminal Court of the City of New York, Bronx County

The People of the State of New York,

against
Alfredo Nieves, Defendant.

Docket No. CR-014831-24BX

Defense Counsel
Ben Macklin
Danielle Altchiler
The Bronx Defenders 
360 East 161st Street
Bronx, NY 10451
bmackin&commat;bronxdefenders.org
DAltchiler&commat;bronxdefenders.org
Bronx District Attorney's Office
Assistant District Attorney Michael Pabon
Assistant District Attorney Teresa Piccolo
198 East 161st Street
Bronx, New York 10451
pabonm&commat;bronxda.nyc.gov
piccolot&commat;bronxda.nyc.gov

Daniel M. Lewis, J.

On June 17, 2024, Defendant was arraigned on charges of VTL §§ 1192(2), 1192(3), and 1192(1) based on his alleged operation of a motor vehicle on June 16, 2024, at approximately 2:20 a.m. in Bronx County while he had a blood alcohol content exceeding .08 per cent. At arraignment, the People served CPL § 710.30(1)(a) notice for a statement made to the arresting officer on scene at 3:25 a.m. On June 30, 2024, the People timely served another CPL § 710.30(1)(a) notice, which contained the 3:25 a.m. statement and added another statement made to the arresting officer on scene at 4:55 a.m.
On November 18, 2024, the Court deemed the People's Certificate of Compliance valid and adjourned the case for motion practice. On January 14, 2025, the Court granted defense's motion for Dunaway, Huntley, Mapp, and Atkins hearings. 
On March 4, 2025, the undersigned confirmed with defense counsel that no other hearings were requested and then presided over the above hearings. The People called one witness: Police Officer (P.O.) Frederick Jimenez-Serrata. Additionally, People's Exhibit #1, P.O. Serrata's body-worn camera (BWC) footage from the incident, and People's Exhibit #2, video footage from inside the Intoxicated Driver Testing Unit (IDTU) room in the early morning of June 16, 2024, were received into evidence without objection.
Below constitutes the Court's decision on defense's preclusion motion, the findings of fact, and conclusions of law from that hearing.
I.PRECLUSION OF THE JUNE 16, 2024 4:55 A.M. STATEMENT
At the conclusion of People's direct examination of their sole witness, P.O. Serrata, defense made an oral motion to preclude the statement from June 16, 2024 at approximately 4:55 a.m., arguing that it was improperly noticed because P.O. Serrata's testimony showed the 4:55 a.m. statement was made at the 45th Precinct IDTU room and not at the corner of St. Anne's Avenue and Westchester Avenue, as reflected on the People's CPL § 710.30(1)(a) notice from June 30, 2024. When asked by the Court, defense counsel acknowledged that his motion papers only requested suppression of properly noticed statements but argued that because the 4:55 a.m. statement was not properly noticed he should not be foreclosed from requesting preclusion.
Persuasive appellate authority has held that the mere act of moving for suppression forecloses the challenge defense requests now (see People v. Williams, 238 AD2d 914 [4th Dept., 1997] ["By moving for suppression, defendant waived his right to challenge the adequacy of the CPL 710.30 notice."]; People v. Lazzaro, 62 AD3d 1035 [3rd Dept., 2009] ["Despite the inadequate notice, most of the statements were admissible against defendant because he moved to suppress his statements, those statements were identified at a hearing addressing their voluntariness and the court denied the motion after the hearing."]). Nonetheless, this court granted defense counsel's request to consider the preclusion issue.
CPL § 710.30 requires the People to, within 15 days after arraignment, serve notice of any statement made by a defendant to a public servant that would be suppressible if involuntarily [*2]made (CPL § 710.30). This notice must "inform defendant of the time and place the oral or written statements were made and of the sum and substance of those statements." (People v. Lopez, 84 NY2d 425, 428 [1994]). Additionally, "[t]he statutory remedy for the People's failure to comply with the statute is preclusion; prejudice plays no part in the analysis." (Id).
"[T]he purpose of CPL § 710.30 is to inform a defendant that the People intend to offer evidence of a statement to a public officer at trial so that a timely motion to suppress the evidence may be made." (People v. Rodney, 85 NY2d 289, 291-92 (1995). Additionally, "[s]o long as the intent to utilize the statement . . . at trial is clearly stated and the notice given is not misleading as to the number or specification of the statements . . . the notice is generally sufficient, even if not complete in every detail." (People v. Centeno, 168 Misc 2d 172, 176-77 (Sup Ct, New York County, 1995).
For validity purposes courts routinely look to whether the People's noticed statement frustrated the controlling statute's purpose rather than whether the notice "lacked certain talismanic details." (Id. at 178; see e.g. [People v. Bowes, 206 AD3d 1260 [3rd Dept., 2022] [denying preclusion when the People's statement notice incorrectly identified the police officer to whom Defendant made the statement but otherwise comported with the statutory requirements]; People v. Rivera, 306 AD2d 186 [1st Dept., 2003] [denying preclusion when the time and location People's statement notice differed from the testimony during the suppression hearing]). Such is the situation here.
The People's June 30, 2024, CPL § 710.30(1)(a) notice was timely made within 15 days of arraignment. Defense counsel concedes that the only flaw in the People's notice for the June 16, 2024, 4:55 a.m. statement was the location where the statement was made. That is, the People informed defense counsel of their intent to use the statement at trial; set forth the correct date, time, and identity to whom the statement was made; and captured the sum and substance of the statement to the defense's satisfaction. Additionally, the IDTU report served at arraignment indicates that Defendant's breath sample was given at 4:46 a.m. Similar to Bowes, the incorrect location of the 4:55 a.m. statement "'did not change the substance of the notice or the ability of defense counsel to make a timely motion for a [suppression] hearing.'" ([People v. Bowes, 206 AD3d at 1265, quoting People v. Daggett, 150 AD3d 1680, 1683 [4th Dept., 2017], lv denied 29 NY3d 1125 [2017]). Thus, defense's motion to preclude the 4:55 a.m. statement is denied.
II. FINDINGS OF FACT
Police Officer Frederick Jimenez-Serrata
P.O. Serrata is currently assigned to the 40th Precinct as a patrol officer. He has been a member of service with NYPD for 5 years, and has been at his current assignment for 4.5 years. P.O. Serrata's job duties include responding to 911 and 311 calls, and he has made and participated in hundreds of arrests. Of those, he was the arresting officer for approximately five arrests involving suspicion of driving while intoxicated, and he participated in approximately one hundred arrests for the same but was not the arresting officer.
At the police academy, P.O. Serrata received training on recognizing the signs of [*3]intoxication, which he stated included evaluating a person's demeanor, voice, way of driving, and body language. P.O. Serrata also received specialized training in identifying an impaired driver and in driving while intoxicated awareness. In his past and in his private life, P.O. Serrata has observed others consume alcohol and the intoxicating effects, if any, the consumption produced.
On June 16, 2024, at approximately 3:25 a.m., P.O. Serrata was on duty, in uniform, inside a marked police vehicle with his partner, P.O. Johnson, responding to a 911 call reporting a motor vehicle accident in the vicinity of St. Ann's Avenue and Westchester Avenue, Bronx County, New York. The incident location is a two-lane, two-way street in a residential area. On the date and time in question, the area was lit by streetlights; weather conditions were clear and dry; and there was little vehicular or foot traffic.
Upon arrival, P.O. Serrata saw a BMW SUV that had collided with a train pillar and an individual, who P.O. Serrata identified as the Defendant, standing approximately ten feet from the car. There was extensive damage to the front end of the SUV; the air bags had been deployed; and no one else was inside the car. The Defendant had the key fob for the BMW on his person.
P.O. Serrata approached the Defendant and asked what happened. In response, P.O. Serrata testified the Defendant stated that he didn't know; he lost control of his vehicle; he made a mistake. P.O. Serrata also testified that at some point the Defendant stated he was on his phone, and that after further speaking with the Defendant he stated that he had consumed alcohol, particularly Coronas. The Defendant told P.O. Serrata that EMS was previously on scene, examined the Defendant, and left before P.O. Serrata arrived. P.O. Serrata explained that EMS does not always wait for NYPD to arrive before they leave.
P.O. Serrata testified that he observed the Defendant for approximately one hour, and during this time observed him to have bloodshot eyes, a flushed face, unsteady balance, and slowed speech, and based on these indicia concluded that the Defendant might have been under the influence of alcohol. During this interaction, all verbal communications were in English; the Defendant was not in handcuffs; neither P.O. Serrata nor his partner made any threats or promises to the Defendant; and the sidearms of P.O. Serrata and his partner remained holstered. The Defendant was not read his Miranda warnings prior to this colloquy, which P.O. Serrata stated was because the Defendant was not under arrest at that point.
Following the Defendant's admission to consuming alcohol, P.O. Serrata stated the Defendant was placed under arrest for driving while intoxicated and transported to the IDTU room at the 45th Precinct. During transport, P.O. Serrata detected a strong odor of alcohol from the Defendant's breath. Upon arrival at IDTU, P.O. Serrata was present for the administration of a breath test conducted by Highway Officer Zimmer.
Prior to People's Exhibit #1 being published, P.O. Serrata explained that some of the indicia he described may not be visible on his BWC, owing to the location of the BWC on P.O Serrata's chest and the consequent angle of filming.
While P.O. Serrata's BWC was published, P.O. Serrata clarified that during the first 20 minutes of his interaction with the Defendant, he observed the Defendant to have bloodshot eyes, [*4]a flushed face, his body to sway upon being asked to stand up, and slowed speech. Additionally, P.O. Serrata averred that the BWC image was insufficiently clear to accurately depict the Defendant's bloodshot eyes.
After People's Exhibit #1 was published, P.O. Serrata testified that the Defendant consented to take a breath test at approximately 4:44 a.m., which showed the Defendant's blood alcohol content to be 0.17. Additionally, P.O. Serrata testified that the Defendant voluntarily participated in a horizontal gaze nystagmus test, a walk and turn test, and a one leg stand test.
After People's Exhibit #2 was published, P.O. Serrata testified that in the ITDU room, P.O. Serrata read the Defendant his Miranda rights and that the Defendant answered his questions, as seen in People's Exhibit #2. During the questioning, three officers were present. No officer made any promises or threats to the Defendant, and no officer had his service weapon.
People's Exhibit #1
The court reviewed the entirety of People's Exhibit #1 and specifically notes the following:
• P.O. Serrata and his partner arrived on scene at approximately 3:06 a.m., ask the Defendant what happened, and the Defendant states, "I crashed, man; I crashed. I was headed home. It was just a mistake. I crashed it. I've been trying to get a tow truck right now." The Defendant then retrieves his driver's license and insurance and gives them to P.O. Serrata's partner.
• At approximately, 3:17 a.m., the Defendant receives a phone call from a towing company. To which P.O. Serrata states, "We already called one, so you are going to have to wait until that one comes." The Defendant then cancels his request.
• From 3:06 a.m. until 3:20 a.m., P.O. Serrata remains on scene and has an opportunity to almost continuously observe the Defendant.
• At approximately 3:20 a.m., an NYPD Sergeant responds to the scene, and the Defendant can be heard saying, "I was on my phone."
• At approximately 3:21 a.m., the Sergeant asks the Defendant, "what happened today?" To which the Defendant replied, "I was just headed home and made a wrong turn and crashed into this." Then, the Sergeant asks, "were you drinking today?" To which the Defendant replied, "a little bit, yeah. Some beers. Coronas. I had a few, maybe two, two or three."
• At approximately 3:22 a.m., the Defendant is placed in handcuffs.
People's Exhibit #2
The court reviewed the entirety of People's Exhibit #2 and specifically notes the [*5]following:
• At approximately 4:44 a.m., the Defendant consents to take a breath test.
• At approximately 4:47 a.m., the Defendant takes the breath test, the results of which indicated a blood alcohol content of .172.
• At approximately 4:48 a.m., Officer Zimmer administers a horizontal nystagmus gaze test and records the results.
• At approximately, 4:50 a.m., Officer Zimmer begins a series of coordination tests and records the results.
• At approximately, 4:55 a.m., P.O. Serrata reads the Defendant his Miranda rights, and the Defendant indicates that he understands each of the rights read and agrees to answer P.O. Serrata's questions.
• At approximately 4:56 p.m., in response to P.O. Serrata's questions, the Defendant stated that he operated the vehicle, was headed home, was coming from hanging out, was unsure when he left, was driving for about half an hour, had been drinking about 6 Corona beers at around the Prospect Avenue 2-train stop, did not recall when he began drinking but stopped about an hour before he left, could not remember when he last ate but recalled it was a turkey and cheese sandwich, was not sick, had not taken any drugs, did not believe his alcohol consumption affected his driving.
III. CONCLUSIONS OF LAW
The court finds that P.O. Serrata was a credible witness and that he testified truthfully. Although some of P.O. Serrata's testimony differed from People's Exhibits #1 and #2, such mistakes are understandable given the passage of time between June 16, 2024, and the date P.O. Serrata testified, and they did not impact his credibility or that of his testimony.
Dunaway/Vandover
For a Dunaway hearing in a VTL § 1192 context, "[t]he standard to be followed is that it is more probable than not that defendant is actually impaired." (People v. Vandover, 20 NY3d 235, 239 [2012]). When coupled with a traffic accident outside police presence, VTL § 1194(1)(a) states, "a police officer may, without a warrant, arrest a person, in case of a violation of [VTL 1192(1)], if such violation is coupled with an accident or collision in which such person is involved, which in fact has been committed, though not in the police officer's presence, when the officer has reasonable suspicion to believe that the violation was committed by such person." That is, police need not have witnessed the accident to make an arrest for VTL § 1192(1) so long as they conclude it is more probable than not that the person was impaired by the consumption of alcohol.
For a VTL § 1192(1) offense, "driving a motor vehicle while there is any alcoholic [*6]impairment of the driver's 'ability to operate such vehicle' would constitute a violation." (People v. Cruz, 48 NY2d 419, 426 [1979]). Indicia of impairment include a suspect's physical appearance (see, People v. Hohmeyer, 70 NY2d 41, 44 [1987]) and speech patterns "even if the suspect's speech is not obviously slurred" ([People v. Millet, 57 Misc 3d 1225[A]*3 [Crim. Ct., New York County 2017]). "Further, the fact of an accident may be construed to circumstantially suggest diminished motor control or impaired driving judgment by reason of alcohol consumption, without regard to proof of fault." (People v. Maher, 52 Misc 3d 136[A]*2 [App. Term, 9th and 10th Jud Dists 2016]).
In this case, P.O. Serrata arrived at the scene of an accident where a BMW SUV had crashed head-on into a train pillar. Defendant was standing approximately ten feet away from the vehicle. When P.O. Serrata asked the Defendant what happened, he stated that he crashed. No one else was present inside or outside the vehicle. Additionally, the Defendant had the vehicle's key fob on his person. Thus, it is more probable than not that defendant operated the vehicle in question.
P.O. Serrata testified that he observed Defendant for about an hour and saw him to have bloodshot eyes, a flushed face, unsteady balance, and slowed speech, which led him to conclude that Defendant was impaired. Later, P.O. Serrata clarified that these observations were made during the first twenty minutes. People's Exhibit #1 shows a total time on scene of approximately 14 minutes before an NYPD Sergeant responds. During those 14 minutes, People's Exhibit #1 shows that P.O. Serrata had sufficient opportunity to observe the Defendant and based on those observations, the collision, his professional training, and personal experience to conclude that it was more probable than not the Defendant's ability to operate the vehicle was impaired by the consumption of alcohol.
Although some of P.O. Serrata's testimony regarding the Defendant's appearance cannot be seen on People's Exhibit #1, P.O. Serrata explained that the camera's positioning on his chest and the resultant filming angle may not show everything he saw with his eyes. The Court's review of People's Exhibit #1 lends credence to the assertion that the video does not fully depict all aspects that someone present would witness. The camera resolution and lighting conditions on scene would impact whether the video depicted the Defendant's flushed face, as testified to by P.O. Serrata. Moreover, P.O. Serrata's own bodily movement would impact whether the video would fully capture the Defendant's unsteady balance that P.O. Serrata testified he observed. Thus, the Defendant's motion to suppress the arrest because it is not supported by probable cause is denied.
Huntley — on scene statement
The People have the burden of proving beyond a reasonable doubt, that the Defendant's statements were voluntary (see People v Anderson, 42 NY2d 35, 38 [1977]; People v Huntley, 15 NY2d 72 [1965]; People v. Johnson, 139 AD3d 967 [2d Dept 2016]). When a person suspected of a crime is taken into custody or significantly deprived of freedom, Miranda warnings must be administered if he or she is to be interrogated (Miranda v. Arizona, 384 U.S. 436 [1966]).
The People's CPL § 710.30(1)(a) notice for the 3:25 a.m. statement indicates that it was [*7]made to P.O. Serrata. However, People's Exhibit #1 contradicts this. The sum and substance of the noticed statements are clearly in response to the responding NYPD Sergeant's questions. Indeed, People's Exhibit #1 shows P.O. Serrata remaining mute during the colloquy where Defendant admits to consuming alcohol on scene. At no point during the hearing, did defense counsel object to this error in the People's notice.
Insofar as the statement was not the product of a promise, threat, or coercion, Defendant's statement was voluntary. P.O. Serrata testified that neither he nor his partner made any promises or threats, and their firearms remained holstered throughout the interaction. However, the standard for determining whether an individual is in custody is an objective one — whether a reasonable person, in the defendant's position, innocent of any crime, would have thought that he or she was free to go (see People v. Yukl, 25 NY2d 585 [1969]; People v. Hall, 125 AD2d 698 [2d Dept 1986]). Subjective beliefs of either the defendant or police officer are not controlling (see People v. Hicks, 68 NY2d 234 [1986]; People v. Contini, 283 AD2d 323 [1st Dept 2001]).
In this case, the Court finds that point occurred at 3:17 a.m. when P.O. Serrata told Defendant that he must wait on scene until the tow truck NYPD called for arrived. Prior to that injunction, Defendant was free to leave and indeed had every opportunity to do so, as public transportation was available. However, the moment P.O. Serrata told the Defendant he had to stay there, no matter how understandable the explanation, a reasonable person, innocent of any crime, would not have thought he was free to go.
The Defendant's answers to the responding NYPD Sergeant's questions occurred after the Defendant was not free to leave, and no Miranda warnings were given. Therefore, Defendant's motion to suppress the on-scene statements at approximately 3:25 a.m. is granted.
Huntley — IDTU statement
At approximately 3:22 a.m., the Defendant is placed in handcuffs and transported by P.O. Serrata and his partner to the IDTU room at the 45th Precinct. People's Exhibit #1 shows that during transport neither P.O. Serrata nor his partner spoke to the Defendant. Additionally, when they arrived at the 45th Precinct, the extent of P.O. Serrata and the Defendant's interaction was to gather pedigree information and inventory the items in the Defendant's possession. At no point did P.O. Serrata ask the Defendant about the incident, and no one advised the Defendant of his Miranda rights.
In the IDTU room, three officers were present. The third was Highway Officer Zimmer, who administered the breath test, horizontal nystagmus test, and coordination tests. At approximately 4:42 a.m., one hour and twenty-two minutes after being placed in handcuffs, the Defendant consents to a breath test and is informed of the numeric result. Approximately 11 minutes later, P.O. Serrata reads the Defendant his Miranda warnings. This was the first time that any law enforcement official advised the Defendant of his Miranda rights. In response, the Defendant indicates he understands them; agrees to answer P.O. Serrata's questions; and does answer P.O. Serrata's questions.
Normally, the effect of a Miranda violation is the suppression of all subsequent [*8]statements, regardless of whether Miranda warnings were later administered. (See People v. Bethea, 67 NY2d 364 (1986)]). However, this is not a bright line rule. The test is whether the "improper, unwarned statement gives rise to a subsequent Mirandized statement as part of a 'single continuous chain of events.'" (People v. Chapple, 38 NY2d 112, 114 [1975]). This calls for a fact specific analysis, including "the time differential between the Miranda violation and the subsequent admission; whether the same police personnel were present and involved in eliciting each statement; whether there was a change in the location or nature of the interrogation; the circumstances surrounding the Miranda violation, such as the extent of the improper questioning; and whether, prior to the Miranda violation, defendant had indicated a willingness to speak to police." (People v. Paulman, 5 NY3d 122, 130-31 [2005]).
In this case, it cannot be said that there was a "single continuous chain of events" between the unwarned statement at approximately 3:25 am and the Mirandized statement over 90 minutes later. First, the statements were made in different locations — the unwarned statement on scene; the Mirandized one inside the IDTU room at the NYPD 45th Precinct. Second, People's Exhibit #1 clearly shows the unwarned statement was in response to the responding Sergeant's questions; whereas, the Mirandized statement was made to P.O. Serrata. In fact, P.O. Serrata was silent during the colloquy that produced the unwarned statement, and the Sergeant was not present at the IDTU room. Third, the extent of the improper questioning was confined to the Sergeant asking the Defendant whether he had drunk alcohol prior to driving and how much. Finally, prior to the Miranda violation, the Defendant was cooperative with the police and willing to speak with them. Upon P.O. Serrata's arrival, the Defendant stated he made a mistake and crashed; he willingly retrieved his license and registration; and he talked to them about getting a tow truck.
Like the Defendant in Paulman, "there was a change in police personnel involved in the successive interrogations, which took place in different locations," and although the statements were not of a different format, as in Paulman, there was a longer break in time between the two statements than in Paulman. (People v. Paulman, supra. at 131). "It is also significant that, from the moment defendant encountered the police . . . defendant exhibited a willingness to provide an explanation of his conduct and, once at the police barracks, he never expressed any reluctance to discuss the allegations. Moreover, the Miranda violation occurred after defendant had freely chosen to answer police questions in a noncustodial setting." (Id).
Here, the evidence offered at the hearing establishes that Miranda warnings were read to the defendant before he was subjected to questioning, and the Court finds that the defendant waived those rights voluntarily, knowingly and intelligently, prior to providing responses to questions. Additionally, for the reasons stated above, the Court also finds that the defendant's IDTU room statement is sufficiently attenuated from the statement made at the scene. Therefore, the Defendant's motion to suppress the IDTU statement is denied.
Atkins
"[A] chemical test must generally be administered within two hours of . . . the time of arrest for a violation of VLT 1192." (People v. Morris, 8 Misc 3d 360 [Crim. Ct., New York [*9]County 2005]). In this case, the evidence shows that the breath test was administered in the IDTU at 4:47 a.m. Even assuming the Defendant was under arrest at 3:17 a.m. when P.O. Serrata told the Defendant he must wait for NYPD's tow truck, the total time is well under the 2-hour mark. Therefore, the Defendant's motion to suppress the breath test is denied.
Dated: March 24, 2025
Bronx, New York
DANIEL M. LEWIS, J.C.C.