# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 65
The People &c.,
   Respondent,
  v.
Ramon Cabrera,
   Appellant.

Barbara Zolot, for appellant.
Joshua P. Weiss, for respondent.
Hon. Letitia James, New York State Attorney General, intervenor.

HALLIGAN, J.:

  Two primary issues are raised in this appeal. The first is whether, in light of the U.S. Supreme Court's recent decision in *New York State Rifle & Pistol Assn., Inc. v Bruen*, 142 S Ct 2111 (2022), New York's criminal prohibition on the unlicensed public carry of

- 1 -

a loaded firearm is unconstitutional (*see* Penal Law § 265.03 [3]). Because defendant Ramon Cabrera's Second Amendment arguments were not preserved as required by New York law, we do not reach the merits of these constitutional challenges. The second is whether Cabrera was in custody for purposes of *Miranda v Arizona*, 384 US 436 (1966), when he was handcuffed and questioned by law enforcement officers. Because the conclusion below that he was not in custody is unsupported by the record, we reverse and remit the case for a new trial.

In August 2016, Cabrera was pulled over for speeding in South Carolina and revealed to a police officer that he had firearms in his car and was driving to his mother's home in the Bronx. Although the defendant held a Florida license for the guns and was legally permitted to possess them in South Carolina, the officer warned him that possession of the guns would be unlawful in New York, and notified the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) about the defendant and his travel plans. That information was relayed to New York City Police Department Detective Kevin Muirhead, who was assigned to the ATF Joint Firearms Task Force. The South Carolina officer shared the details of his encounter and Cabrera's license plate number with Detective Muirhead, and Muirhead determined that the car was registered to a Bronx address associated with Cabrera's mother.

Around 8:00 p.m. that evening, Detective Muirhead and two colleagues, Lieutenant Peter Carretta and ATF Special Agent Adam Schultz, began a stakeout of the mother's residence. When Cabrera arrived at approximately 10:00 p.m., Detective Muirhead pulled up behind his car. The officers exited their vehicle and approached the defendant as he

emerged from his car. Muirhead identified himself as a police officer and asked for the defendant's name and his destination. Cabrera was "calm and cooperative," and provided his name and stated that the house belonged to his mother. Detective Muirhead later testified that Cabrera was handcuffed, though he could not recall at what point in the encounter the handcuffs were applied or who had done so.

When asked for identification, the defendant permitted one of the officers to retrieve his wallet from the vehicle's center console. In removing the driver's license from the wallet, the officer also found a Florida Concealed Carry Permit. Detective Muirhead then asked Cabrera whether "there were any firearms in the vehicle [he] should be aware about"; Cabrera informed him that there were three handguns and a rifle in the trunk and permitted him to open it. Upon doing so, Detective Muirhead observed the top portion of a rifle. He asked Cabrera whether he had a New York State Carry Permit, and Cabrera responded "no." Cabrera was then arrested and brought to the Task Force's office, along with his vehicle.

An hour and a half after the officers apprehended him, Cabrera was placed in an interrogation room and his handcuffs were removed. Special Agent Schultz read Cabrera each of the *Miranda* warnings from a form, and Cabrera acknowledged them by nodding affirmatively, initialing next to each warning, and signing the bottom of the form. Detective Muirhead then read to Cabrera from a "consent to search" form, which informed him that, among other things, he had the right to refuse to give consent, that he could withdraw his consent at any time before the search's termination, that any contraband found during the search could be used against him, and that he could consult with an

attorney before he consented to the search. While apprising Cabrera of both the *Miranda* waiver and "consent to search" form, Special Agent Schultz referred to them as "formalit[ies]" and suggested the search needed to be completed before the car could be returned to the defendant's mother. When asked if he was authorizing the search of the car, Cabrera nodded affirmatively and signed the form. Immediately after, Cabrera said he wanted a lawyer and no further questioning occurred. Cabrera did not, however, withdraw his consent to the search or ask to consult with an attorney about the search. Given Cabrera's consent, Detective Muirhead searched the trunk, recovering a disassembled rifle, three handguns, and several boxes of ammunition.

Cabrera later moved to suppress both the statements he made to police while handcuffed and the physical evidence found in his vehicle. He argued that he had been placed in custody when "confronted by three officers who immediately handcuff[ed] him" and that the officers failed to read him his *Miranda* rights prior to questioning him. He further argued that he never voluntarily consented to a search of the vehicle because his initial verbal consent was involuntary and a fruit of an improper custodial interrogation, and the consent form signed at the Task Force's office was tainted by the prior unlawful custodial interrogation and involuntary in light of certain comments by the police.

Supreme Court denied the suppression motion. The Court assumed, as the People conceded it should, that Cabrera was handcuffed before he was questioned, but it nonetheless concluded that the detective was permitted to question Cabrera without first issuing *Miranda* warnings. The handcuffing, the Court explained, ensured the officers' safety and "did not transform the encounter into a full-blown arrest requiring probable

cause." The court further concluded that under the totality of the circumstances, both the defendant's on-scene consent to search his trunk and written consent at the office were voluntary.

Cabrera pleaded guilty to one count of criminal possession of a weapon in the second degree (Penal Law § 265.03 [3]). The Appellate Division rejected Cabrera's suppression claims and affirmed the judgment. It held that the hearing court correctly determined that even if the defendant was handcuffed when he was questioned about the guns outside his mother's house, the handcuffing did not elevate what was otherwise an investigatory detention to custody for *Miranda* purposes, and thus the officers did not first have to provide *Miranda* warnings before questioning Cabrera about the guns. The court also rejected Cabrera's challenge to admission of the physical evidence, noting that the officers acquired probable cause to search the vehicle under the automobile exception once the defendant admitted to possessing the firearms. Further, the court agreed with Supreme Court's conclusion that Cabrera voluntarily consented to a search of his car both at the scene and in the Task Force office. A Judge of this Court granted Cabrera leave to appeal.

On appeal to this Court, Cabrera claims to have been in custody for *Miranda* purposes when he was handcuffed and asks this Court to adopt a rule that a handcuffed person is per se in custody for purposes of *Miranda*. He further contends that there is no record support for the Appellate Division's finding that he was not in custody under the circumstances and that both his oral and written consent to the search were tainted by the *Miranda* violation and independently involuntary. In addition, the defendant raises several

constitutional challenges to his conviction and sentence for the first time on appeal to this Court in light of the Supreme Court's recent decision in *Bruen*.

I.

We begin with Cabrera's Second Amendment challenges. Cabrera argues that, because Penal Law § 265.03 (3) criminalizes unlicensed possession of a firearm, the constitutionality of that statute necessarily rose or fell with the constitutionality of the licensing regulations in effect at the time he was charged. In his view, the U.S. Supreme Court's decision in *Bruen* rendered unconstitutional the entirety of New York's licensing regime, and that in turn meant that Penal Law § 265.03 (3) was facially unconstitutional. Cabrera further argues that the statute is unconstitutional as applied to him on several grounds. He contends that because he was able to obtain a valid gun license in Florida, we must assume that New York's proper cause requirement alone made his unlicensed possession criminal. Cabrera also alleges a violation of his right to travel under the Privileges and Immunities Clause based on what he construes as a residency requirement for New York licenses. Finally, Cabrera argues that the felony classification and authorized sentencing range for violations of Penal Law § 265.03 (3) violate the Second Amendment, Eighth Amendment, Due Process Clause, and Equal Protection Clause in light of *Bruen*.

It is undisputed that Cabrera did not raise these constitutional arguments before the trial court, as is generally required to preserve such challenges for this Court's review (*see People v Baumann & Sons Buses, Inc.*, 6 NY3d 404, 408 [2006]; *see also e.g. People v Davidson*, 98 NY2d 738, 739 [2002] ["Because defendant's constitutional challenge to the

loitering statute was made for the first time on his motion pursuant to CPL 330.30, it was not properly preserved"]).  Cabrera nonetheless argues that his lack of preservation should be excused, claiming that it would have been "futile, if not frivolous," to challenge Penal Law § 265.03 (3) prior to *Bruen.*

Unlike the trial courts and the Appellate Division, this Court's jurisdiction is limited to "questions of law" (NY Const art VI, § 3; *People v Turriago*, 90 NY2d 77, 80 [1997]). We have long maintained that, absent certain limited exceptions, a reviewable question of law exists only if it was presented to the trial court in the first instance; generally, "points which were not raised at trial may not be considered for the first time on appeal" (*People v Thomas*, 50 NY2d 467, 471 [1980]; CPL 470.05 [2]).  This rule helps ensure that errors are avoided or corrected at the earliest possible opportunity (*see People v Hunter*, 17 NY3d 725, 727-728 [2011]; *see also People v Peque*, 22 NY3d 168, 183 [2013]).  It also gives the parties an essential opportunity to probe relevant factual and legal issues, thereby ensuring that the record before this Court reflects a full airing of the points that bear upon an ultimate merits determination (*see e.g. People v Martin*, 50 NY2d 1029, 1031 [1980] [no preservation exception where record was not developed as to existence of exigent circumstances that may have justified warrantless arrest]).  Preservation of a constitutional challenge, in particular, "ensures that the drastic step of striking duly enacted legislation will be taken not in a vacuum but only after the lower courts have had an opportunity to address the issue and the unconstitutionality of the challenged provision has been established beyond a reasonable doubt" (*see Baumann & Sons Buses*, 6 NY3d at 408, citing *Matter of Van Berkel v Power*, 16 NY2d 37, 40 [1965]).  For these reasons, we have

carefully guarded the preservation rule against "erosion" (*People v Mack*, 27 NY3d 534, 540-541 [2016]).

One "very narrow exception," termed the "mode of proceedings" exception, allows a defendant to raise unpreserved challenges to "the essential validity of the proceedings conducted below" by alleging "error[s] that would affect the organization of the court or the mode of proceedings proscribed by law" (*People v Patterson*, 39 NY2d 288, 295-296 [1976]). In *Patterson*, the defendant relied on a U.S. Supreme Court decision issued during the pendency of his appeal (*Mullaney v Wilbur*, 421 US 684 [1975]) to argue that he was unconstitutionally forced to bear the ultimate burden of persuasion on his extreme emotional disturbance defense to murder. We underscored the critical importance of preserving objections before the trial court, but nonetheless held that the error asserted fit within a "mode of proceedings" exception and was therefore reviewable. Cabrera does not argue that his Second Amendment arguments fall within this "tightly circumscribed class" (*People v Kelly*, 5 NY3d 116, 120 [2005]) of nonwaivable errors (*cf. People v David* [decided today]).

*Patterson* also noted that at the time of the defendant's trial, "there was no doubt in this State that the . . . affirmative defense was constitutionally valid" (*Patterson*, 39 NY2d at 296), and "no intimation that the homicide provisions might be vulnerable to serious constitutional challenge" (*id.* at 294). Although we had previously rejected a general exception to our preservation requirement based on a change in the law (*see People v Reynolds*, 25 NY2d 489, 495 [1969], citing *O'Connor v Ohio*, 385 US 92 [1966]), we stated that "[t]he defendant's failure to object . . . cannot deprive him of the right to attack that

practice when an intervening Supreme Court decision calls that practice into question" (*Patterson*, 39 NY2d at 296).

Cabrera relies on this passage of *Patterson*, contending that his unpreserved *Bruen*-based challenges are reviewable "because they are based on an intervening Supreme Court decision that overruled binding precedent after judgment was entered," and the dissent in *People v Garcia*, decided today, takes the same view. In addition to *Patterson*, Cabrera points to *People v Baker*, 23 NY2d 307 (1968), in which this Court reviewed the merits of an unpreserved claim under the Confrontation Clause. At the time of trial, the claim in *Baker* had been squarely foreclosed by *Delli Paoli v United States*, 352 US 232 (1957), but *Delli Paoli* was subsequently overruled by *Bruton v United States*, 391 US 123 (1968). Again relying upon *O'Connor*, we concluded that "[t]he error cannot be ignored upon the ground that no proper objection was made since in this pre-*Bruton* case their admission under limiting instructions was proper" (*Baker*, 23 NY2d at 317 [citation omitted]).

To the extent *Patterson* and *Baker* can be read as setting forth a "futility" exception where an intervening U.S. Supreme Court precedent gives rise to a constitutional claim previously foreclosed by this Court's precedent, such an exception is not warranted here. Both *Patterson* and *Baker* relied upon *O'Connor*, a decision in which a state high court refused to consider a claim on the ground it was barred by a state procedural rule after the U.S. Supreme Court had granted certiorari, vacated, and remanded to the state court to carry out exactly that task. Then just one year after *Patterson*, the U.S. Supreme Court clarified that States, if they wish, may enforce their "normal and valid" procedural rules,

like preservation, to bar review of claims based on intervening U.S. Supreme Court precedent (*Hankerson v North Carolina*, 432 US 233, 244 n 8 [1977]).

In the years following *Patterson*, we consistently required preservation in a series of cases presenting constitutional claims based on intervening U.S. Supreme Court precedent.  In *People v Thomas*, 50 NY2d 467 (1980), we held that an intervening U.S. Supreme Court decision will not excuse preservation if the claim previously foreclosed under the Federal Constitution was already available under state law.  There, the Appellate Division had relied on *Patterson* in reviewing an unpreserved error regarding a jury charge on intent.  The defendant argued that the charge violated the U.S. Supreme Court's intervening decision in *Sandstrom v Montana*, 442 US 510, 513 (1979), by including a presumption that effectively absolved the People from proving an essential element of the crime.  This Court reversed, explaining that the charge in *Sandstrom* had long been held erroneous under state law (*see Thomas*, 50 NY2d at 472).  As for the defendant's claim that *Sandstrom* now made the charge unconstitutional under federal law, we held that "the rule requiring a defendant to preserve his points for appellate review applies generally to claims of error involving Federal constitutional rights" (*Thomas*, 50 NY2d at 473).  We further noted with approval the U.S. Supreme Court's instruction in *Hankerson* that "when the defendant claims, for the first time on appeal, that the court's charge erroneously shifted the burden of proof, the State courts are free to enforce 'the normal and valid rule that failure to object to a jury instruction is a waiver of any claim of error' " (*id.*, quoting *Hankerson v North Carolina*, 432 US 233, 244 n 8 [1977]).

Both before and after *Patterson*, we have explained that preservation is essential where the failure to raise a claim in the court of first instance means that the appellate record is inadequate to fairly assess the merits, even if governing law was altered by an intervening Supreme Court decision. For example, in *People v Martin*, 50 NY2d 1029, 1031 (1980), the defendant sought review of an unpreserved claim that he had been arrested inside his home without a warrant in violation of the rule announced a few months earlier in *Payton v New York*, 445 US 573 (1980). *Payton* changed the law in New York, which at the time of the defendant's trial allowed warrantless arrests inside the home even absent exigent circumstances. We concluded that the defendant's failure to raise his constitutional challenge before the trial court "deprive[d] the People of a fair opportunity to present their proof on th[e] issue" of exigent circumstances, rendering the record "inadequate to permit the appellate court to make an intelligent determination on the merits," and thus did not review the unpreserved claim (*Martin*, 50 NY2d at 1031). Other cases reach a similar conclusion (*see People v Gonzalez*, 55 NY2d 887, 888 [1982] [same]; *People v Gates*, 24 NY2d 666, 669-670 [1969] [not reaching unpreserved claim under *Davis v Mississippi*, 394 US 721 (1969), because failure to timely object deprived People of opportunity to establish lawful grounds for arrest]; *People v Friola*, 11 NY2d 157, 158-160 [1962] [not reaching unpreserved claim under *Mapp v Ohio*, 367 US 643 (1961), because record contained no inquiry as to lawfulness of alleged search and seizure]).

These cases demonstrate the high bar for excusing preservation on the basis of an intervening U.S. Supreme Court decision. There can be little doubt that *Bruen* effected a dramatic change in how States may regulate possession of guns in public, or that this

Court—like others around the nation—will face an array of significant questions in its wake.[1]  On that point, we agree with the dissent in *Garcia*.  But as with virtually all our prior cases regarding unpreserved constitutional challenges, adjudication of those issues will have to await a case in which they have been duly preserved.

Several factors lead us to this conclusion.  First, unlike the Confrontation Clause claim raised in *Baker*, Cabrera's Second Amendment claims were not foreclosed by binding precedent from this Court or the U.S. Supreme Court at the time of trial.  Defendant points to intermediate appellate authority upholding the proper cause requirement that *Bruen* abrogated (*see e.g. Matter of Corbett v City of New York*, 160 AD3d 415 [1st Dept

---

[1] *See e.g. United States v Daniels*, 77 F4th 337 (5th Cir Aug. 9, 2023) (federal statute prohibiting firearm possession by unlawful users of controlled substance unconstitutional as applied to marijuana user); *Range v Attorney Gen. United States of Am.*, 69 F4th 96 (3d Cir June 6, 2023) (en banc) (federal felon-in-possession statute unconstitutional as applied to defendant with felony welfare fraud conviction); *United States v Rahimi*, 61 F4th 443 (5th Cir 2023), *cert granted* 143 S Ct 2688 (June 30, 2023) (federal statute prohibiting firearm possession by persons subject to domestic violence restraining order is not consistent with historical tradition and thus facially unconstitutional); *United States v Bullock*, No. 18-CR-165-CWR-FKB, ___ F Supp 3d ___, 2023 WL 4232309 (SD Miss June 28, 2023) (federal felon-in-possession law unconstitutional as applied to defendant with prior aggravated assault and manslaughter convictions); *United States v Price*, 635 F Supp 3d 455 (SD W Va Oct. 12, 2022) (federal statute prohibiting possession of a firearm with removed, obliterated or altered serial number facially unconstitutional); *Firearms Policy Coalition, Inc. v McCraw*, 623 F Supp 3d 740 (ND Tex Aug 25, 2022), *app dismissed sub nom. Andrews v McCraw*, No. 22-10898, 2022 WL 19730492 (5th Cir Dec. 21, 2022) (Texas criminal prohibition on handgun carry by individuals aged 18 to 20 years old facially unconstitutional); *Commonwealth v Guardado*, 491 Mass 666, 206 NE3d 512 (Mass Apr 13, 2023) (convictions for unlawful possession of firearm and ammunition violated rights under Second Amendment and Due Process Clause where jury was not instructed that lack of licensure was essential element of offense).

2018]), but even in the face of adverse Appellate Division precedent, litigants are expected to preserve their constitutional challenges to facilitate potential review by this Court.

Cabrera also calls our attention to *Kachalsky v County of Westchester*, 701 F3d 81 (2012), and *People v Hughes*, 22 NY3d 44 (2013).  While acknowledging that "[a] number of courts and academics[ ] take the view that *Heller*'s reluctance to announce a standard of review is a signal that courts must look solely to the text, history, and tradition of the Second Amendment," the Second Circuit in *Kachalsky* concluded that means-end intermediate scrutiny applied to public carry of firearms and upheld the proper cause requirement later invalidated in *Bruen* (*Kachalsky*, 701 F3d at 89 n 9).  As with any federal circuit court ruling, *Kachalsky* did not bind this Court.

In *Hughes*, this Court considered a Second Amendment challenge to the classification of criminal possession of a weapon in the second degree (Penal Law § 265.03 [3]) as a felony.  Notably, the defendant did not contest the State's authority to treat his conduct as a crime.  Instead, he objected to the relative severity of punishment imposed.  In rejecting the contention that the Second Amendment barred classifying unlawful possession as a felony, we emphasized that "New York's criminal weapon possession laws prohibit only *unlicensed* possession of handguns," and held that if any Second Amendment scrutiny applied to the severity of punishment for concededly unlawful conduct, intermediate scrutiny was appropriate (*id.* at 50-51).  Deeming that standard satisfied, the Court concluded that the sentence imposed on Hughes was not constitutionally infirm (*id.* at 51).

At the time of Cabrera's conviction in January 2018 and appeal to the Appellate Division in early 2022, neither this Court nor the U.S. Supreme Court had determined whether New York's proper cause requirement violated the Second Amendment. While *Hughes* could fairly be read to adopt intermediate scrutiny in the Second Amendment context, as the dissent in *Garcia* notes (*Garcia*, decided today, dissenting op at 11), it did not consider the proper cause requirement or address any of the Second Amendment arguments the defendant now asks us to consider: whether the Second Amendment invalidates a conviction for unlicensed possession where the licensing scheme includes a proper cause requirement; whether New York's licensing scheme imposes a residency requirement and, if so, whether the Second Amendment bars that condition; or whether the Second Amendment precludes classification and sentencing disparities between in-home and public possession.

Moreover, unlike the challenge to the affirmative defense in *Patterson*, the arguments that Cabrera now presses were not unanticipated at the time of his trial. *Bruen* rested on the U.S. Supreme Court's prior decisions in *District of Columbia v Heller*, 554 US 570 (2008) and *McDonald v City of Chicago*, 561 US 742 (2010). Those rulings did not speak directly to how the Second Amendment right applied outside the home or resolve the appropriate level of scrutiny, and it is clear that early on, some courts and individual judges viewed *Heller* as dispensing with means-end scrutiny—just as the Supreme Court eventually held in *Bruen* (*see Ezell v City of Chicago,* 651 F3d 684, 708 [7th Cir 2011] [applying more rigorous scrutiny to Second Amendment challenge to Chicago's prohibition on firing ranges]; *Heller v District of Columbia*, 670 F3d 1244, 1271 [DC Cir

2011] [Kavanaugh, J., dissenting] ["*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny"]; *Moore v Madigan*, 702 F3d 933, 937, 942 [7th Cir 2012] [Circuit Court was "bound by the Supreme Court's historical analysis" as "central" to *Heller*, therefore holding the Second Amendment applied outside the home]; *Peruta v County of San Diego*, 742 F3d 1144, 1167, 1173-1175, 1179 [9th Cir 2014], *revd on reh en banc*, 824 F3d 919 [9th Cir 2016] [opining that the Second Circuit did not properly grapple with history in *Kachalsky* and that the gun regulations at issue in *Drake*, *Woollard*, and *Kachalsky* should have been struck down even under intermediate scrutiny]; *Kanter v Barr*, 919 F3d 437, 451 [7th Cir 2019] [Barrett, J., dissenting] [arguing a categorical felony ban on lawful handgun possession was unconstitutional because "(f)ounding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons"]).

Notably, by 2017, the U.S. Court of Appeals for the D.C. Circuit had invalidated the District of Columbia's "proper cause" licensing requirement and interpreted *Heller* as "dispens[ing] with tiers of scrutiny in striking down a ban on possession by almost everyone" (*Wrenn v District of Columbia*, 864 F3d 650, 664 [DC Cir 2017]). Both before and after *Wrenn* was decided, some New York litigants directly attacked *Kachalsky* as wrongly decided under *Heller* and *McDonald*. For example, in May 2013, the New York State Rifle & Pistol Association challenged a New York City rule regarding firearm transport and New York's gun licensing regime. Relying on *Heller*'s historical analysis, the plaintiff contended that the right to transport and possess guns outside a primary

residence was a "core" Second Amendment right, and that *Kachalsky* erred in applying intermediate scrutiny (*New York State Rifle & Pistol Assn. v City of New York*, 86 F Supp 3d 249, 259 [SDNY 2015], *affd sub nom. New York State Rifle & Pistol Assn., Inc. v City of New York*, 883 F3d 45 [2d Cir 2018], *vacated and remanded sub nom. New York State Rifle & Pistol Assn., Inc. v City of New York, New York*, 140 S Ct 1525 [2020] [hereinafter *NYSRPA v CNY*]; *see also Osterweil v Bartlett*, 706 F3d 139 [2d Cir 2013] and *Osterweil v Bartlett*, 21 NY3d 580, 587 [2013] [assessing a related constitutional challenge to New York's gun licensing regime]).

After the federal district court granted summary judgment to New York City and the Second Circuit affirmed, the U.S. Supreme Court granted certiorari in January 2019 to evaluate the constitutionality of the challenged city and state regulations. Although the Supreme Court later dismissed the case as moot following an amendment to the relevant statute and regulation (*see NYSRPA v CNY*, 140 S Ct 1525, 1526 [2020]), the dissents and concurrence raised serious doubts about the means-ends test, relied heavily on the historical reasoning laid out in *Heller*, and noted the Court's eagerness to revisit the issue (*id.* at 1527 [Kavanaugh, J., concurring] [agreeing with Justice Alito's dissent that federal and state courts should refocus on historical analysis and signaling that "(t)he Court should address that issue soon"]). The *Bruen* plaintiffs themselves took a similar approach, explicitly arguing in their February 2018 complaint that *Kachalsky* "was wrongly decided" and that it should be overruled (*see also Libertarian Party of Erie County v Cuomo*, 970 F3d 106, 127 [2d Cir 2020] [noting plaintiffs contended that "*Kachalsky* was wrongly decided"]).

Given these developments, we cannot conclude that the potential success of these arguments was so unanticipated as to excuse preservation.

Second, unlike the intervening decisions relied upon in *Baker* and *Patterson*, *Bruen* did not directly address the constitutional questions that Cabrera now seeks to raise. *Bruen* ruled that New York's proper cause standard for issuance of public carry licenses violates the Second and Fourteenth Amendments (*Bruen*, 142 S Ct at 2122, 2126, 2137). It did not address the rest of New York's licensing scheme or the interplay between the invalidation of New York's proper cause requirement and state statutes criminalizing unlicensed possession of a firearm, as the dissent in *Garcia* acknowledges (*Garcia*, decided today, dissenting op at 16). In fact, several of the *Bruen* concurrences explicitly noted that the opinion "decide[d] nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun" (*id.* at 2157 [Alito, J., concurring]); that it did "not prohibit States from imposing licensing requirements for carrying a handgun" (*id.* at 2161 [Kavanaugh, J., concurring]); and that it did not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill" (*id.*, quoting *Heller*, 554 US at 626-627). For this reason, the circumstances of this case are distinguishable from those presented in *O'Connor*, on which we relied in both *Patterson* and *Baker*.

Third, and critically, the failure to preserve Second Amendment challenges in the court of first instance stymied the development of a record that would allow for careful and deliberate adjudication on the merits of constitutional challenges presented to us (*see Martin*, 50 NY2d at 1031). The advent of the one-step history and tradition test does not, alone, compel the conclusion that New York's criminal possession of a weapon statutes

are facially unconstitutional. Rather, that determination must be made by closely analyzing historical analogues to assess whether our modern regulations are consistent with historical tradition. The nature of that complex inquiry only underscores the importance of preservation (*see United States v Bullock*, No. 18-CR-165-CWR-FKB, ___ F Supp 3d ___, 2023 WL 4232309 [SD Miss June 28, 2023] [noting difficulty of judicial analysis of historical analogues without benefit of expert reports or amicus briefs]). By way of comparison, when the U.S. Supreme Court considered a single component of New York's licensing scheme in *Bruen*, it had the benefit of an extensive record, hundreds of pages of briefing on historical analogues and over 80 amici submissions. We simply do not have the record, at this juncture, to give the constitutional questions regarding Penal Law § 265.03 (3) the careful consideration they deserve. To the extent that the classification and sentencing disparities between offenses involving in-home and public possession must be justified as consistent with historical tradition, the record before us likewise does not permit a meaningful determination on the merits (*see Martin*, 50 NY2d at 1031).

Cabrera's as-applied challenges are unreviewable for a similar reason. His failure to preserve his Second Amendment claim deprived the government of the opportunity to argue that he would have been otherwise ineligible to obtain a license and thus was not aggrieved by the proper cause requirement. Nor are we persuaded that because he obtained a valid out-of-state license it must be presumed that he would have met all of the constitutionally valid requirements for licensure in *this* State. The defendant himself acknowledges that New York's licensing scheme is more onerous than Florida's (and we note that more onerous does not necessarily mean unconstitutional). Finally, the record

has not been adequately developed as to whether the defendant meets any purported residency requirement imposed by the State's licensing scheme, which precludes review of his claim under the Privileges and Immunities Clause. To the extent Cabrera raises an Eighth Amendment claim, that too is subject to the preservation requirement.

For the above reasons, we do not reach the merits of Cabrera's constitutional challenges on an underdeveloped record and without the benefit of the careful consideration by the courts and the parties below.[2] We take no position on whether Cabrera would have had standing to bring his *Bruen* claims had he timely raised them, or on the merits of the various *Bruen* claims addressed in the dissent to *People v Garcia* (decided today).

## II.

We turn now to the question regarding whether Cabrera was in custody for purposes of *Miranda* when he was handcuffed and questioned by law enforcement officers in his mother's driveway, and whether his subsequent consents to a search of his vehicle were valid (*see Miranda v Arizona*, 384 US 436 [1966]).

Cabrera contends that the lower courts erred in concluding that he was not in custody for purposes of *Miranda* when he was handcuffed outside his mother's house, and that his statements regarding the firearms in his vehicle and his lack of a New York license should have been suppressed accordingly. *Miranda* warnings must be administered when an

---

[2] Consistent with this Court's practice, remittal is not available to develop a claim that is otherwise unreviewable on preservation grounds.

interrogation occurs "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" (*id.*). Not every stop constitutes custody for purposes of *Miranda*. To ascertain custodial status, we must consider "whether a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave" (*People v Paulman*, 5 NY3d 122, 129 [2005]), and whether there has been a "forcible seizure which curtails a person's freedom of action to the degree associated with a formal arrest" (*People v Morales*, 65 NY2d 997, 998 [1985], citing *Berkemer v McCarty*, 468 US 420 [1984]; *see also People v Bennett*, 70 NY2d 891, 894 [1987] ["When a seizure of a person . . . does not constitute a restraint on his or her freedom of movement of the degree associated with a formal arrest, *Miranda* warnings need not be given"]).

While the Appellate Division's determination that Cabrera was not in custody for *Miranda* purposes must be affirmed if supported by the record (*see Paulman*, 5 NY3d at 129), a reasonable innocent person in Cabrera's position could not have felt free to leave when three law enforcement officers approached him at night, on a residential street, and handcuffed him before questioning him about the firearms in his vehicle. The level to which the police restricted Cabrera's movement was of a degree associated with a formal arrest. Nor does the record suggest that the defendant had any reason to believe that he would be handcuffed only for a limited duration. We therefore conclude that there is no record support for the conclusion of the courts below that Cabrera was not in custody for *Miranda* purposes. On appeal, the People have conceded that the defendant was subject to interrogation and that they did not argue below that the public safety exception applied.

Custodial status is therefore dispositive; in the absence of warnings, his statements should have been suppressed.

In reaching this conclusion, we decline to adopt a per se rule that the use of handcuffs places an individual in custody for purposes of *Miranda* in all instances. In prior decisions, we have stressed that the custodial status analysis is inherently fact-specific, as it turns on the point of view of a reasonable person innocent of any wrongdoing under the circumstances (*see e.g. Paulman*, 5 NY3d at 129; *Harris*, 48 NY2d at 215; *Yukl*, 25 NY2d at 589). In only one circumstance—where a defendant is interrogated "at gun point"—has this Court indicated that the defendant is in custody for *Miranda* purposes as a matter of law (*People v Shivers*, 21 NY2d 118, 120 [1967]; *see also People v Huffman*, 41 NY2d 29, 34 [1976]). Admittedly, there may be very few circumstances where a handcuffed person is not in custody for purposes of *Miranda* given the obvious physical constraint and association with formal arrest. Thus, the use of handcuffs must appropriately be given very substantial weight in this inquiry, but we do not believe it to be dispositive.

This approach accords with that adopted by other state and federal courts, which have accorded significant—but not dispositive—weight to the use of handcuffs in assessing whether an individual is in custody for purposes of *Miranda*. For example, the U.S. Court of Appeals for the Second Circuit noted that "[h]andcuffs are generally recognized as a hallmark of a formal arrest" but assessed their impact on the defendant in light of the specific circumstances presented (*United States v Newton*, 369 F3d 659, 675, 677 [2d Cir 2004] [handcuffs were "the problematic factor in (that) set of circumstances" given that the record had no indication that a person "in the (defendant's) situation would have

understood that the handcuffing would likely last only until the officers had completed their search"]; *see also United States v Martinez*, 462 F3d 903, 909 [8th Cir 2006] [defendant in custody, "considering the totality of the circumstances," when he was detained, patted down, questioned, and then "handcuffed and told he was being further detained"]; *State v Wilson*, 142 NM 737, 747-748, 169 P3d 1184, 1194-1195 [2007] [defendant in custody when handcuffed and placed in the back of a police car]; *Commonwealth v Damiano*, 422 Mass 10, 13, 660 NE2d 660, 662 [1996] [a person "handcuffed in the back seat of a police cruiser in the middle of the night on a multi-lane State highway" is in custody]; *compare United States v Coulter*, 41 F4th 451, 460 [5th Cir 2022] [handcuffed individual not in custody where officer informed the defendant he was "going to detain (him)" so he did not "run up and grab the gun" and the defendant "implicitly acknowledged the limited purpose of the restraint"]).

Given our holding that Cabrera was in custody and the undisputed fact that he had not received *Miranda* warnings when he answered Detective Muirhead's questions, Supreme Court erred in denying his motion to suppress his responses regarding guns in the car and his lack of a New York license. For that reason, Cabrera's guilty plea should be vacated (*see People v Grant*, 45 NY2d 366, 379-380 [1978]).

While Cabrera also challenges Supreme Court's denial of his motion to suppress the physical evidence found in his vehicle, the record supports the determinations below that the defendant voluntarily consented to the search of his vehicle in writing at the Task Force office. The burden of proving voluntariness lies with the People and is a question of fact (*see People v Kuhn*, 33 NY2d 203, 208 [1973], quoting *People v Whitehurst*, 25 NY2d

389, 391 [1969]). Relevant factors include whether the suspect was in custody at the time, the number of officers present, the defendant's background, whether the defendant was restrained, whether the defendant aided or resisted law enforcement, and whether the police advised the defendant of their right to withhold consent (*see People v Gonzalez*, 39 NY2d 122, 128 [1976]).

When the defendant signed the consent form at the Task Force office, he was in police custody, but the record—both the video of the interaction and the testimony at the suppression hearing—confirms that the handcuffs had been removed, he had been read his *Miranda* warnings, he was calm and cooperative, and he had been specifically advised that he could refuse to consent to the search or withdraw his consent once given.[3] Additionally, Detective Muirhead read the consent form aloud, including the provisions that required the defendant's consent be voluntary and stated his right to refuse or withdraw consent and demand a search warrant. Immediately after signing the consent form, Cabrera invoked his right to counsel, suggesting that he appreciated the rights covered in the *Miranda* warnings and the consent form.

While Special Agent Schultz regrettably referred to the two forms as mere "formalit[ies]" and suggested the car could be returned to the defendant's mother once it was searched, there is record support for the conclusion that those comments did not vitiate the voluntariness of Cabrera's consent in light of the indicia of voluntariness. Given that

---

[3] Given that Cabrera was specifically advised that he could withdraw his consent to search his vehicle once given, his knowledge that the detective had already found the guns does not require a different conclusion.

Cabrera voluntarily gave written consent to the search at the office, we need not separately assess whether the automobile exception applies or whether the oral consent the defendant gave at the scene was voluntary and independently sufficient to allow admission of the physical evidence.

To the extent that our case law on successive interrogations after a *Miranda* violation applies to a consent to search, the voluntariness of Cabrera's written consent was not impermissibly tainted by the *Miranda* violation committed when he was initially handcuffed.  In determining whether there is a "single continuous chain of events" (*People v Chapple,* 38 NY2d 112, 115 [1975]) or a "sufficiently 'definite, pronounced break in the interrogation' to dissipate the taint from the *Miranda* violation" (*Paulman*, 5 NY3d at 131, quoting *Chapple*, 38 NY2d at 115]), we have considered various factors as set forth in *People v Paulman* (5 NY3d at 130-131).  In *Paulman*, we held that Mirandized statements made after an un-Mirandized statement were admissible given the different locations of the interrogations, the different methods used to elicit information, a change in police personnel, and the "marked change in the tenor of [the defendant's] engagement with police" (*id*. at 131).

Similar factors support our conclusion that the *Miranda* violation which occurred when Cabrera was initially stopped and handcuffed did not render his later written consent to search involuntary.  The written consent was given at a different location than the prior un-Mirandized statements, about ninety minutes later, and under much different circumstances evincing a "change in . . . tenor" of Cabrera's engagement with police (*id.*

at 131).[4]  Most notably, he was not in handcuffs surrounded by several officers on the street.  These circumstances are distinguishable from the "single continuous chain of events" in *Chapple*, in which an officer forced the defendant into his vehicle, took him to the site of a burglary and questioned him, gave *Miranda* warnings, continued to question him as he took the defendant to the sites of additional burglaries, took him to police headquarters where he continued questioning, and obtained a confession (*Chapple*, 38 NY2d at 114).

*          *          *

Accordingly, the order of the Appellate Division should be reversed and the case remitted to Supreme Court for further proceedings in accordance with this opinion.

---

[4] There are factual distinctions between the circumstances of the subsequent interrogation in *Paulman* and the circumstances of the written consent to search here, but "[n]o one factor is determinative and each case must be viewed on its unique facts" (*Paulman*, 5 NY3d at 131).  Particularly given the 90-minute lapse between the *Miranda* violation and the subsequent written consent at the Task Force office—a significantly longer interval than the approximately 30-minute interval between successive interrogations in *Paulman*—we conclude there was no "single continuous chain of events" here (*Chapple*, 38 NY2d at 115).

RIVERA, J. (dissenting):

The police had information that defendant Ramon Cabrera was driving across state lines to his mother's home in New York with weapons in the trunk of a car that was registered to her. The police staked out her home, waiting for defendant. When he arrived, police approached, handcuffed defendant, and then asked if he had weapons. Defendant calmly and forthrightly responded he had a rifle and three handguns in the trunk, which, with his consent, they opened and saw part of the rifle. In response to further questioning, defendant stated that he did not have a New York carry permit. The officers then arrested and took defendant to the precinct where law enforcement searched the car and retrieved the weapons and ammunition from the trunk.

I agree with the majority that defendant was in custody when he was handcuffed and before he was informed of his rights, and therefore his inculpatory responses to the officer's questioning should be suppressed (*see* majority op at 19). However, I would make clear that, as a matter of law—and reality—any person placed in handcuffs is thereby in custody and constitutionally entitled to *Miranda* warnings.

Contrary to the majority's view, the record establishes that defendant did not voluntarily consent to the search merely by signing a police form which the detective told him was a "formality." Therefore, the weapons and ammunition, in addition to the statements, must also be suppressed. The prosecution cannot convict defendant without this evidence and therefore the charging instrument should be dismissed.

I.

Handcuffing is Custody for *Miranda* Purposes

To protect the Fifth Amendment right against self-incrimination, *Miranda* warnings are mandated prior to the interrogation of a suspect who is in custody (*Miranda v Arizona*, 384 U.S. 436, 444, 457 [1966]). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" (*id.* at 444). *Miranda* rights "become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest'" (*Berkemer v McCarty*, 468 US at 440 [1984], quoting *California v Beheler*, 463 US 1121, 1125 [1983] [per curiam]; *United States v Newton,* 369 F3d 659, 676-677 [2d Cir 2004] [a person in handcuffs was in custody for *Miranda* purposes, even when the

police officers informed the defendant that they were not under arrest]). "Handcuffs are generally recognized as a hallmark of a formal arrest" (*United States v Newton,* 369 F3d 659, 676-677 [2d Cir 2004], citing *New York v Quarles*, 467 US 664, 655 [1984]). While handcuffing can be "reasonable to the officers' investigatory purpose under the Fourth Amendment, [it] nevertheless place[s the suspect] in custody for purposes of Miranda" (*United States v Newton,* 369 F3d 659, 676-677 [2d Cir 2004], citing *Berkemer*, 468 US at 440).

Several armed officers stopped defendant late at night and placed him in handcuffs based on information from out-of-state law enforcement that defendant was traveling with unlicensed firearms. In response to the officers' questions defendant admitted to having weapons, without a carry permit, in the trunk of the car he was driving. The majority and I are in full agreement that once defendant was handcuffed he was in custody for *Miranda* purposes and therefore his subsequent inculpatory statements should have been suppressed (*see* majority op at 19). However, unlike the majority, I take this opportunity to clarify that any person placed in handcuffs is in custody as a matter of law, and therefore entitled to *Miranda* warnings.

Handcuffs have a long, sordid history, including as a tool of bondage (*United States v Malebran*, 26 F Cas 1145, 1146 [CCDNY 1820] [describing handcuffing as a chattel slavery practice]). Today most people associate their use law enforcement, and recognize the "two metal rings, joined by a short chain, that are locked around a prisoner's wrists to

prevent        free        movement" (Cambridge        Dictionary,        handcuffs [https://dictionary.cambridge.org/us/dictionary/english/handcuffs]).

Handcuffs are restraints, full stop. Indeed, handcuffs are commonly used to physically restrain a person during an arrest (*Burch v City of New York*, 2016 WL 11430773, *6 [ED NY Apr. 22, 2016, No. 11CV2841CBAVMS], quoting NYPD Patrol Guide Procedure No. 203-11 ["(a)fter an individual has been controlled and *placed under custodial restraint using handcuffs* and other authorized methods" (emphasis added)]). But a person may be placed in custody short of an arrest because, under our objective test, a person is in custody when "a reasonable person innocent of wrongdoing would have believed that [they are] not free to leave" (*People v Paulman*, 5 NY3d 122, 129 [2005]; *People v Yukl*, 25 NY2d 585, 589 [1969]). Once handcuffed, a person is in custody; they cannot reasonably believe that they are free to leave. If they tried to leave, they would be chased by law enforcement, all the while their wrists would be locked in metal. In fact, New York defines the crime of "escape" as requiring "proof that defendant 'escape[d] from custody.' 'Custody,' in turn, 'means restraint by a public servant'" (*People v Antwine*, 8 NY3d 671, 674 [2007], citing Penal Law § 205.00 [2]).

The singular purpose of handcuffs is to restrain. Goals well understood by law enforcement personnel in the field and the individuals they restrain with these "metal bracelets." Thus, there are obvious benefits to avoiding individualized determinations when the common throughline in all cases is that handcuffs are the type of physical restraints that the individual knows they cannot escape.

There is no situation in which handcuffing does not restrain an individual and therefore handcuffing places the person restrained in custody under *Miranda* (*People v Quarles*, 58 NY2d at 666 [suppressing unwarned statements of suspect who had been frisked and handcuffed], *revd on other grounds*, *New York v Quarles*, 467 US 649 [1984]). Neither this Court nor the United States Supreme Court has ever recognized an instance of handcuffing that was *not* custody for purposes of *Miranda* (*id.*, *see also, e.g.*, *Dunaway v New York*, 442 US 200, 215 & n 17 [1979] [describing handcuffing as a "trapping[] of a technical formal arrest"])

The majority has chosen to continue the ad hoc, case-by-case approach to handcuffing even though the Court has repeatedly extolled the benefits of bright line rules, especially as regards the constitutionality of law enforcement practices. As we have explained, "in addition to providing the rationale for resolution of particular cases, rules give necessary guidance to lower courts and to police. Police officers are well served when they are advised, in advance, as to whether their proposed conduct will be lawful" (*People v Gomez*, 5 NY3d 416, 420 [2005]). We have "sought to provide and maintain 'bright line' rules to guide the decisions of law enforcement and judicial personnel who must understand and implement our decisions in their day-today operations in the field" (*People v Garcia*, 20 NY3d 317, 323 [2012], quoting *People v. P.J. Video,* 68 NY2d 296, 304 [1986]).

The rule is readily understood, even in a fast-paced police encounter. If an officer handcuffs someone, all they need do is advise the individual of their *Miranda* rights, or not ask any questions until those warnings are administered. It's as simple as that. The rule

does not undermine law enforcement. To the contrary, the rule ensures proper police conduct. The benefits are obvious: ease of application in the field and in our courts; reduction in the misapplication of *Miranda;* and confidence in law enforcement and our judicial system.

## II.

### Defendant Did Not Voluntarily Consent to a Vehicle Search

"Consent to search is voluntary when it is a true act of the will, an unequivocal product of an essentially free and unconstrained choice. Voluntariness is incompatible with official coercion, actual or implicit, overt or subtle" (*People v Gonzalez*, 39 NY2d 122, 128-129 [1976]).[1] Courts have excluded evidence obtained by misstatements that create uncertainty or confusion about an individual's constitutional right to deny consent. For example, in *United States v Cruz*, the federal district court held the consent to search involuntary where a police officer stated he would otherwise clearly get a warrant if the defendant did not consent to the search. The court explained that "public policy favors a prophylactic rule of exclusion where law enforcement officers misstate facts" and where, as in that case, the defendant was misinformed by the misrepresentation (*United States v Cruz*, 701 F Supp 440, 447-448 [SD NY 1988]; *cf. People v Dunbar*, 24 NY3d 304 [2014]

---

[1] The prosecution's assertion that the decision here is controlled by *United States v Patane* (542 US 630 [2004]), which held that a lack of *Miranda* warnings on its own does not require suppression of the physical fruits of a suspect's unwarned by voluntary statements, is unpreserved and unreviewable.

[finding a preamble to *Miranda* warnings, which was, "at best confusing and at worst misleading," made the *Miranda* warning inadequate and ineffective because it "undercut the meaning of all four *Miranda* warnings, depriving (defendants) of an effective explanation of their rights"]).

Here, after defendant's arrest and transport to the precinct, and before he was advised of his rights, Detective Muirhead referred to the *Miranda* warnings as "things we need to go through, formalities, once we do that… we can get to the meat of things." Following the *Miranda* warnings, Detective Muirhead then read a vehicle search consent form to defendant "just to search the vehicle," adding that the form—like the waiver of the *Miranda* warnings given moments before—was merely "another formality . . . for you and us" and implying that they could not release the car to his mother until they completed the search, stating:

> "This next form is a consent to search. I kind of talked to you about it before. It's just to search your vehicle. It's another formality—it's your mom's car, and you want to give it back to her, and so this is something we gotta do, you know, for you and for us."

By then it was almost midnight, an hour and a half after defendant was arrested in his mother's driveway, and hours after driving to New York.[2]

---

[2] The majority cites *People v Paulman* (5 NY3d at 130-131) to assert that defendant voluntarily consented to the search at the precinct despite the previous un-Mirandized warnings, in part because of the "change . . . in tenor" of the interaction (majority op at 23). In *Paulman*, this Court declined to suppress a statement that was not "elicited as part of a single continuous chain of events," stemming from a *Miranda* violation (*id*. at 132). *Paulman* distinguished *People v Bethea* (67 NY2d 364, 368 [1986]), where this Court found that "close sequence" of unwarned statements and later, warned statements warrants

Critically, when defendant signed the vehicle search form, he was aware that Detective Muirhead knew about and saw the weapons. While handcuffed outside his mother's home, defendant himself told the detective that there were three guns and a rifle in the trunk, and at the same time he gave the detective permission to open the trunk, which he did and upon seeing part of the rifle he immediately arrested defendant. Thus, defendant had no reason to doubt the detective's statement that his signature on the form was a formality, even though that mischaracterized the need for consent since earlier that night defendant had admitted the presence of weapons and had already consented to Detective Muirhead opening the trunk to look inside. Although we now hold that this consent was obtained in violation of defendant's rights and cannot be used against him, defendant did not know that at the time he signed the form. The majority is incorrect to the extent it suggests that defendant understood that the perfunctory language in the consent-to-search form, which indicated he could withdraw consent, would prevent the admission of the gun the officer had previously seen during the stop (majority op at 23). The futility of withdrawing consent was further bolstered by the officer referring to the forms as necessary before they could "get to the meat of things." The confusion and uncertainty as to

---

suppression of both (*id.* at 132). However, in *Paulman*, the Court found that the change in tenor distinguishing the case from the "single continuous chain of events" in *Bethea* was based on several factors: the defendant initiated the initial interaction with police at his home, different police officers questioned the defendant at the precinct, and there was a long cessation of interrogation while the defendant ate a meal (*id*. at 132). Here, the factual scenario is directly opposite: the police initiated the initial interaction, the same police officers transported defendant to the precinct, and there was no significant gap in questioning for a meal. Contrary to the majority's view (majority op. at 25), the record bears out that the "tenor" of the interactions between defendant and law enforcement remained the same throughout the evening.

defendant's rights caused by the prior search and detective's minimization of the importance of the written consent was compounded by the suggestion that refusing to sign would only further delay releasing the car to defendant's mother (*Matter of 2029 Hering St., Bronx, NY*, 464 F Supp 164, 172 [SD NY 1979] [finding that for "an average layperson" one of the factors indicating that the consent was not voluntary but merely "submi[ssion] to a claim of lawful authority" was the defendant "seeing her own property searched"]). Under these circumstances, defendant did not voluntarily consent to the car search.

III.

Dismissal of the Indictment Is Required

Defendant's statements as well as the weapons discovered in the trunk should have been suppressed. Therefore, I would reverse and dismiss the indictment (*People v Stokes,* 32 NY2d 202, 207 [1973]).[3]

Order reversed and case remitted to Supreme Court, Bronx County, for further proceedings in accordance with the opinion herein. Opinion by Judge Halligan. Judges Garcia, Singas, Cannataro and Troutman concur. Judge Rivera dissents in an opinion, in which Chief Judge Wilson concurs.

Decided November 21, 2023

---

[3] My conclusion that the indictment should be dismissed makes it unnecessary for me to address defendant's Second Amendment claims. A preservation and merits analysis of various *Bruen* claims are set forth in my dissent in *People v Garcia* (decided today).